## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ICE EMBASSY, INC., *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-97-0196 |
| | § | |
| THE CITY OF HOUSTON, | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs are sexually-oriented businesses ("SOBs") who challenge on First Amendment grounds an ordinance regulating such businesses ("Ordinance 97-75") adopted by Defendant City of Houston in January 1997. The case was tried to the Court on the issue of whether the external distance restrictions, in light of Ordinance 97-75 as a whole, affords reasonable alternative avenues of communication for SOBs. Having reviewed the full record in this case, having heard the witnesses' testimony, and having considered the exhibits introduced at trial, the Court issues the following Findings of Fact and Conclusions of Law.[1]

---

[1] The Court explains the evidence and uses various forms of the word "find" to indicate a finding of fact, and sets forth legal principles and uses forms of the words "hold" and "conclude" to indicate a conclusion of law. To the extent a finding of fact so designated is more properly a conclusion of law, and to the extent a conclusion of law is more properly a finding of fact, it should be so construed.

The Court concludes that there were an adequate number of reasonable alternative sites for SOBs displaced by Ordinance 97-75. As a result, the Court denies Plaintiffs' challenge to Ordinance 97-75 and holds that the ordinance does not violate the First Amendment.

## I.    PROCEDURAL BACKGROUND

The City of Houston ("City"), through its City Council, adopted Ordinance 97-75, effective January 15, 1997, amending prior ordinances regulating SOBs. Plaintiffs challenged Ordinance 97-75 on numerous First Amendment grounds. The Court concludes the following: The Court has subject matter jurisdiction over this lawsuit, and has personal jurisdiction over the parties. Venue in this district and division is appropriate. At least one Plaintiff, as an owner and/or operator of an SOB that has been denied a permit based on the locational requirements of Ordinance 97-75, has standing to bring this action. Consequently, all Plaintiffs have standing. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *James v. City of Dallas*, 254 F.3d 551, 563 (5th Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002).

This Court issued its original decision in 1998, and the case was appealed to the United States Court of Appeals for the Fifth Circuit. The Fifth Circuit, in *N.W. Enterprises Inc. v. City of Houston*, 352 F.3d 162 (5th Cir. 2003), *cert. denied*, 543 U.S. 958 (2004), affirmed in part, dismissed in part, reversed in part, vacated in part,

and remanded in part.  Following remand, the parties engaged in discovery and tried the single remanded issue – described in the following paragraph – to the Court for ten trial days beginning December 4, 2006.

The United States Court of Appeals for the Fifth Circuit remanded this case for the determination of "whether there exists any basis for the fear . . . that the ordinance seeks to reduce secondary effects by depriving SOBs of reasonable alternative avenues of communication."  *See N.W. Enterprises*, 352 F.3d at 183.  The issue before this Court is whether the increased distance requirements in Ordinance 97-75 were enacted by the City Council to reduce SOBs' negative secondary effects with the Council's reasonable understanding that there were an adequate number of alternative available sites within the City limits for SOBs to operate in conformity with the requirements of Ordinance 97-75.

To be a reasonably alternative avenue of communication for an SOB, an alternative location must be physically and legally available, but need not be commercially desirable.  *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (2002); *Woodall v. City of El Paso*, 49 F.3d 1120, 1124 (5th Cir. 1995); *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1276-77 (5th Cir. 1988).  A "reasonable" number of sites exists if those enterprises that desire to operate can find physically and legally

available locations. *See Lakeland Lounge of Jackson, Inc. v. City of Jackson*, 973 F.2d 1255, 1260 (5th Cir. 1992).

## II.   BACKGROUND OF ORDINANCE 97-75

### A.   The SOB Permit Process

The Court finds the following:  There are many types of SOBs described in Ordinance 97-75.  An arcade is a business where five or fewer patrons place money into a machine that allows them to observe live or recorded performances.  An adult mini-theater is a similar SOB but is intended to be used by more than five but fewer than 100 patrons.  At adult bookstores, patrons may view, rent, or purchase adult books, magazines, films, or videotapes, and at an adult movie theatre, patrons in projection rooms.  A cabaret provides live entertainment, generally either topless dancing or totally nude performances.  If the cabaret is licensed to serve alcoholic beverages, it is sometimes referred to as an adult lounge.  At an adult encounter parlor, patrons "congregate, associate, or consort with employees who engage in specified sexual activities with or in the presence of" the patrons.  An adult modeling studio provides "figure models" who engage in sexual activities with or "display specified anatomical areas" to the patron.

For years prior to Ordinance 97-75 and under Ordinance 97-75, City law required SOBs to obtain a permit in order to operate within the City of Houston.

Permit applications were filed with the Houston Police Department's Vice Division, which determined whether the applications complied with City ordinances, including the locational requirements of the current ordinance.[2]  If the Vice Division determined that an applicant satisfied the requirements for a permit, the application would be approved and the permit would be issued.  Otherwise, the Vice Division would deny the permit application.

When evaluating the permit applications, the Vice Division requested from the City Planning and Development Department ("Planning Department") a map of the location and surrounding area of the site for which the permit was requested.  The maps showed tract boundaries and "property use codes."  The maps, which were regularly used by the City in connection with a variety of its municipal functions, were generated by computer using the most current and accurate information available to the City.[3]  The Harris County Appraisal District ("HCAD") provided information about tract ownership and acreage, but the City's Planning Department would only incorporate the

---

[2]     Enforcement of Ordinance 97-75 has been enjoined pending a final decision on the issues in this case.

[3]     In 1986, the City hired an engineering firm to develop a computer-based mapping system. The firm developed a program known as "Metrocom."  Later, the City took back authority over the mapping program and database, which became part of the City's Geographic Information Services ("G.I.S.").  Most Vice Division officers, however, continued to refer to G.I.S., its offices, and the maps it produced as "Metrocom," and that is the name used throughout the trial and in these Findings of Fact and Conclusions of Law.

HCAD database into its map-generating database after the HCAD information had been verified and corrected to the extent possible. The Vice Division soon learned through experience that the land use codes on the maps were not always accurate and, therefore, they used them only as guides for the proposed location and the surrounding areas.

In order to determine if a site proposed for an SOB met the City ordinance requirements, Vice Division officers then visited the actual proposed site and scrutinized the surrounding area. Although the "use codes" on the Metrocom maps were not reliable, the Vice Division officers found the property boundary lines and distances depicted on the maps to be quite accurate when compared with actual measurements using a surveyor's measuring wheel. Most distances between property lines of proposed sites for SOBs and property lines of other entities could not, however, be measured with the measuring wheel because of physical barriers, such as buildings, on the intervening properties.

An applicant who was denied a permit had the right to appeal the decision to a Hearing Officer appointed by the Chief of Police. If the Hearing Officer exercised his authority to reverse the Vice Division's decision, the applicant-appellant would be issued a permit to operate an SOB. When the Hearing Officer's decision resolved an issue of statutory interpretation, the Vice Division officers would thereafter apply the

Hearing Officer's decision when evaluating subsequent permit applications presenting the same issue.

## B.   Legislative History of Ordinance 97-75

The Court finds from the evidence at trial the following as to the legislative history of Ordinance 97-75.  In May 1996, the Houston City Council appointed several of its members to serve on a committee, named the Sexually Oriented Business Ordinance Revision Committee (the "Committee"), to consider amendments to the existing SOB Ordinance.  The Committee began collecting information from numerous sources regarding the activities and effects of SOBs in Houston.  Soon thereafter, the Planning Department began assisting the Committee to determine whether the locational requirement changes under consideration would allow SOBs a sufficient opportunity to continue to operate.  Among other issues, the Committee wanted to know whether, if the amendments being considered were adopted, SOBs affected by the proposed locational amendments would be able to relocate to sites that satisfied the new locational requirements.

At a meeting in June 1996, the Committee discussed its intention to address continuing secondary effects of SOBs by increasing the sensitive use distance

requirement[4] to 1,500 feet, a distance already enforced in Harris County.  The Co-Chairman of the Committee, Council Member Boney, stated that the City could not infringe SOBs' rights to operate and, therefore, the SOB Ordinance would need to allow an adequate number of reasonable alternative sites to which SOBs could relocate.

At a Committee meeting in July 1996, Council Member Boney again emphasized that the City could not use regulations to eliminate SOBs.[5]  Robert Litdke, then director of the City Planning Department, attended the meeting and described his department's capabilities and procedures for estimating the number of alternative sites that would be available under the proposed increased distance requirements.

In October 1996, Joseph Chow, a long time employee of the City Planning Department, and Litdke, Chow's supervisor, appeared before the Committee.  Litdke provided the Committee with a detailed overview of the Planning Department's capabilities and again explained its methodology for calculating the availability of alternative sites for SOBs under the distance restrictions of both the current ordinance and the proposed increased restrictions of the new ordinance.  Litdke explained that the

---

[4]     A "sensitive use" includes a school, church, public park, or licensed daycare center, and the "sensitive use distance requirement" is used interchangeably with the term "external distance requirement" or simply "distance requirement."

[5]     Plaintiffs argue that Council Member Helen Huey requested information and made comments that Plaintiffs characterize as evidence of a City Council animus against SOBs.  Even if Council Member Huey held the anti-SOB sentiment that Plaintiffs ascribe to her, there is no evidence that any other member of City Council shared her views.

Planning Department was using the same methodology it previously used to determine the availability of alternative avenues of communication for the Council's consideration in passing the 1991 SOB ordinance (which was still in effect).  Applying each of the locational requirements then being considered, the Planning Department filtered over one million potential tracts down to 9,993 conforming potential sites.

The Council Members asked the Planning Department to add public parks as a sensitive use to its analysis.[6]  The Council Members also asked the Planning Department to determine the potential impact of increasing the residential density distance requirement from 1,000 to 1,500 feet from the center of the potential tract. Chow appeared before the Committee at its November 4, 1996 meeting to update the Committee members on the Planning Department's progress in adding parks to the database.  Chow also described the Planning Department's projections regarding how the addition of public parks as a sensitive use might affect the number of conforming parcels, and answered additional questions by Committee members.

Chow explained that he and his staff began the analysis with more than one million land parcels in the City as identified by HCAD.  He and his staff then subtracted parcels that, based on land use codes obtained from the best information

---

[6]     The Committee also requested an evaluation of the effect of adding hospitals, nursing homes, and libraries to the list of sensitive uses.  None of these was listed as a sensitive use in the Ordinance as adopted.

available, they believed would not be suitable for use by an SOB.  The Planning Department used a computer program that drew a circle with a radius of 1,550 feet from the center of each public park and excluded every parcel with a center point within the circle.[7]  This process was repeated with a circle of 1,050 foot radius for evaluating the effect on existing licensed SOBs listed by the Vice Division.  The process of elimination was then repeated for the remaining sensitive uses, which included schools, churches, and daycare centers, using a 1,550 foot radius.

To perform this analysis, Chow's staff did not rely on the land use codes on the maps in the database; rather, they compiled a list of parcels identified as sensitive uses using various other pertinent sources such as lists of public parks and lists of licensed daycare centers.  The program then applied the residential density test and estimated the number of remaining parcels potentially available.[8]  As Chow reported to the

---

[7]     The computer program did not measure distances from property line to property line, as required in the Ordinance, because it would have taken an additional four to six weeks to develop the programming required to perform the analysis.  This was true because the computer, although quite sophisticated for that time, was not programmed to recognize and measure distances between two or more parcels' property lines.  To accomplish this task, a person would have had to plot points along the property lines manually.  To compensate for the fact that distances were being measured in the program from the centers of the tracts involved, Chow's staff added 50 feet to the 1,500-foot and the 1,000-foot sensitive use distance radii being considered by the Committee.

[8]     Out of necessity Chow's staff used a 1,550-foot radius to draw the circles and, unlike for the other sensitive uses,  used the land use codes in the database to identify residential properties.

Committee on November 20, 1996, his assessment was that the number of potential sites was 7,597.

The Committee also received information of the status of SOBs in Houston, including the number of existing, licensed SOBs, both the total number and the number of each type licensed by the City.  The Committee found that there were 104 licensed SOBs as of August 29, 1996, including 36 topless clubs, 9 adult theaters, 9 totally nude clubs, 4 video stores, 28 modeling studios, and 18 adult bookstores.

The Committee issued its final report on January 7, 1997.  The Houston City Council accepted the Committee's report and, on January 15, 1997, enacted Ordinance 97-75 to prohibit SOBs from operating within 1,500 feet of a school, church, public park, or licensed daycare center.  *See* Ordinance 97-75, § 28-125(b)(1).  Ordinance 97-75 also prohibits SOBs from operating in high density residential areas or within 1,000 feet of another SOB.  *See id.* § 28-125(b)(2) and (3).  Plaintiffs are SOBs in Houston who would be affected by the enforcement of the above-described external distance requirements.

Retired Houston Police Officer Robert Foulis testified at trial.  Before he retired in 2004, he had responsibility within the Vice Division for providing information both to the public and to the Police Department regarding SOBs in Houston.  One of Foulis's regular duties in this position was to compile lists of known SOBs in Houston for the

Vice Division to use in its enforcement activities.  Based on his personal knowledge at the time and on Vice Division records, Foulis prepared a list of businesses holding SOB permits as of January 1997.  The list contained 101 licensed SOBs, three fewer than existed in August 1996.

The Ordinance allowed existing SOB permit holders to apply for permits under the new ordinance by a date certain and thereby protect their locations from any new SOB that applied for a location within 1,000 feet of the existing permit holders' locations.[9]  Ninety-eight applications were received by the Vice Division within the 45 day period provided in the Ordinance.

The Court finds that, as of the date of the enactment of Ordinance 97-75, there were 101 licensed SOBs in Houston.  There also were 25 SOBs operating under the protection of an injunction issued in a federal lawsuit challenging the 1991 ordinance.[10]  The information provided to the Committee indicated that there were 95 SOBs that

---

[9]     This provision did not guarantee a permit to the existing SOB permit holder.  Instead, it allowed the existing permit holder to have its application evaluated under the new locational requirements before consideration of the application of any applicant that sought to operate an SOB within 1,000 feet.

[10]     The Fifth Circuit noted in its opinion in this case that "there were at most 128 SOBs in Houston when 97-75 was enacted."  *See N.W. Enterprises*, 352 F.3d at 182.  This figure was based on the parties' pre-appeal estimate; this Court had not yet determined the number of SOBs in operation in January 1997.

would be displaced as a result of the locational requirements of the proposed new ordinance.

The Court finds further that the City Planning Department's information that there were 7,597 potential sites to which SOBs could locate was based on the best data available at the time and provided a sound basis for the Committee to conclude that there existed an adequate number of available alternative avenues for communication. Chow opined that his analysis had a 10% rate of error, but based this opinion only on his experience in the Planning Department working with HCAD data.  The Court concludes, however, that even if the percentages were reversed and the analysis were only 10% accurate, the resulting 760 alternative available sites would more than adequately accommodate SOBs affected by the external distance requirements of Ordinance 97-75 or, alternatively, all previously licensed SOBs.

## III.   SUBSEQUENT VERIFICATION OF ADEQUATE SITES

In 1997, Plaintiffs filed this lawsuit and asserted that there were not an adequate number of available alternative sites for SOBs to operate under the locational requirements of Ordinance 97-75.  Despite the fact that the information provided to City Council by the Planning Department clearly revealed that, even excluding the vast majority of the 7,597 sites identified by Chow, there were an adequate number of available alternative sites, the City undertook to respond to Plaintiffs' concerns by

having Houston Police Officer Steven Andrews, and other officers working under his direction, examine a small percentage of the locations identified by the Planning Department.  Andrews, a fifteen year veteran of the Vice Division, investigated the potential sites as if permit applications had been filed for each location.  During his career, Andrews had performed dozens of similar investigations in connection with permit applications filed pursuant to earlier SOB ordinances.

The Court finds that the evidence establishes the following facts regarding Andrews's 1997-98 review of potential available sites for SOBs within the City of Houston.  In his prior investigations for SOB permit applications, Andrews sought to determine whether a proposed site met the distance criteria necessary for the issuance of a permit.  To evaluate the impact of Ordinance 97-75 for purposes of this case, Andrews employed the same methodology he had used throughout his career in the Vice Division, but applied the external distance requirements from Ordinance 97-75 to each location.

More specifically, Andrews applied the criteria of Ordinance 97-75 to each location he investigated to determine whether any part of the boundary of the potential SOB tract was at least 1,500 feet from the closest boundary line of property on which any church, school, licensed daycare center or public park was located.  He also investigated to determine whether no more than 75% of the tracts within a 1,500 foot

radius from the center of the potential SOB tract were residential, and that the boundary of the potential SOB tract was at least 1,000 feet from the boundary of any other potential SOB tract identified in his report. To assist in his investigation, and consistent with his practice while an officer in the Vice Division, Andrews requested maps of potential locations from G.I.S/Metrocom. At this time in 1997, Metrocom was using the same program to generate maps that it had used in 1996. Ultimately, Andrews obtained over 2500 Metrocom maps, each showing a potential parcel for an SOB. Andrews received 50 to 100 maps at a time. He divided the maps among pairs of officers, including himself, and instructed them to perform a first stage review in which the officers visited and visually inspected each location designated by a star on the map.[11] If the officers saw a sensitive use nearby or saw that the area around the suggested site might be sufficiently residential to fall within the 75% residential prohibition, the officers rejected the site summarily and no further investigation was conducted. If there appeared to be no sensitive uses within 1,500 feet and the area did not appear to be excessively residential within the 1,500 foot radius, the site "passed" the officers' review. This first phase review was primarily to rule out sites that likely violated any of the locational requirements of Ordinance 97-75.

---

[11]     Occasionally, only one of the two officers in the pair would perform this first stage review.

The maps included land use codes, indicating religious uses, residential uses, commercial uses, and other uses. The officers and Andrews used these land use codes on the maps only as a starting point or guide in their decisions as to whether a potential site "passed" or not. The officers and Andrews based their decisions about the availability of the sites on the actual uses of the property and surrounding parcels with the applicable radii, as determined during their personal visit to the "passed" sites.

As to potential sites that passed the first phase review, Andrews personally evaluated each site and the relevant surrounding areas to make a determination of the availability of the site in light of the requirements of Ordinance 97-75. Andrews used the definitions in that ordinance to locate the center point of the tract. Using a radius of 1,500 feet, he then drew a circle from the center point of the tract. Andrews then visited the site to locate the boundaries of the tract. In doing this, he occasionally had to use a measuring wheel. In this regard, he did not find any differences between the distances shown on the Metrocom maps and the distances he physically measured on the site from objectively ascertainable points. The scale depicted on the maps was accurate every time he measured a distance on a tract. Using the 1,500 foot circle he had drawn on the associated Metrocom map as a guide, he carefully drove or walked the area within the circle. If he saw a school, licensed daycare center, church, or park,

or if the area was predominantly residential, he would reject the site as "unavailable" for use by an SOB.

Andrews obtained official lists of public parks and licensed daycare centers, which he used to identify and locate these two types of sensitive uses. If he saw a daycare center that was not on the list, he would check with the appropriate governmental agency to see if the center had been licensed after the list was compiled. If he was still unsure if the center was licensed, he would visit it and ask to see its permit. As required in the Ordinance, he considered public parks and licensed daycare centers to be disqualifying uses if the nearest point on the property line of the sensitive use was within 1,500 feet of the nearest point of the property line of the potential site. *See* Ordinance 97-75, § 28-125(b)(1).

In deciding whether a location was an available alternative site, Andrews considered whether any type of SOB could fit on the site. He testified persuasively that the smaller sites could accommodate a modeling studio or an adult bookstore. A modeling studio generally has a central area and one or more private rooms; modeling studios often are located in small houses or mobile homes. The standard driveway or the public street in front of the building or tract of land provides adequate parking, because in Andrews's experience as a Vice Division officer, customers usually do not

park at the studio (where their cars might be recognized); they instead park elsewhere and walk to the studio.

Andrews soon realized that some of the potential locations identified by Chow and Metrocom were very close to each other.  Because he also needed to apply the 1,000 foot distance requirement between SOB sites, he asked Metrocom to prepare larger scale maps showing all of the sites in given areas ("cluster maps").  Andrews used these cluster maps to identify which of the sites meeting the sensitive use and residential density requirements were also likely to be less than 1,000 feet apart.  He used the individual site maps and his personal inspections to determine which of the sites within a "cluster" would be an available alternative site.  Once he found an acceptable site, he summarily rejected the other potential sites within 1,000 feet.  Many of these "rejected" sites, however, would likely have been available under the terms of the Ordinance, had the original site later been determined not to be an adequate site.

Andrews spent approximately six months on this project.  He received over 2,500 maps from Metrocom, numbered sequentially from 001 to 2821.  Either he or the officers assisting him visited about 1,561 sites, of which 1,030 "passed" and 531 were rejected based on the officers' superficial review of the location and surrounding area. Of the 1,030 sites that passed the first phase review, Andrews personally visited about 500 locations.  Between December 1997 and February 1998, Andrews identified 200

sites (out of the 500 or so sites he closely evaluated) that he believed met all of the distance requirements in Ordinance 97-75. He took a photograph of each location and assembled a notebook with one page summarizing identification information for each site.[12]

Andrews ended his investigation after investigating only 1,536 of the 7,597 potential sites identified by Chow. After his list of available sites reached 200, Andrews stopped his analysis. He did not investigate any of the remaining sites for which he had maps and he did not request any additional maps. His ability to verify approximately 200 conforming sites from such a small percentage of Chow's list suggests strongly that many more available sites would be found if the remaining 6,061 locations identified by Chow had been evaluated closely.

The 200 sites identified by Andrews within a year after the adoption of Ordinance 97-75 were from the list of sites identified by Chow within months before the adoption of Ordinance 97-75. The Court finds that because sites identified by Chow as available before January 15, 1997, were verified by Andrews as available during the year after January 15, 1997, these sites were available at the time the Ordinance was adopted on January 15, 1997.

---

[12]    The notebook contained a few errors, such as photos or acreage listing that were not accurate. Nonetheless, the notebook was a helpful tool to refresh Andrews's recollection of the sites and to assist others in locating or assessing the properties.

IV.   **AVAILABLE ALTERNATIVE SITES**

A.   **Required Number of Available Alternative Sites**

The "provision of just one more site than the existing number of SOBs satisfies a city's obligation to provide alternative avenues of communication." *N.W. Enterprises*, 352 F.3d at 182 n.20 (citing *Woodall*, 49 F.3d at 1127). A city is not required to provide SOB sites to accommodate a specific proportion of the city's population. *See id.* (citing *Lakeland Lounge*, 973 F.2d at 1259-60). Plaintiffs have cited no authority from this Circuit, and the Court is aware of none, requiring a city to provide an adequate number of alternative available sites to accommodate anticipated future growth, speculative "total demand," or unlicensed businesses, even if those unlicensed businesses may compete for sites with licensed businesses. The Court does not find the Ninth Circuit cases relied upon by Plaintiffs to be persuasive.[13]

The Court finds that at the time the Ordinance was enacted, there were 101 licensed SOBs, plus approximately 25 SOBs protected by an injunction issued in other litigation. Only 95 of those SOBs would be required to relocate if Ordinance 97-75 were enforced.[14] The City, under the Fifth Circuit's analysis, could have satisfied its

---

[13]   *Isbell v. City of San Diego*, 258 F.3d 1108, 1114 (9th Cir. 2001); *Young v. Simi Valley*, 216 F.3d 807, 822 (9th Cir. 2000).

[14]   In fact, many of the 95 businesses appear to have ceased operation in the ten years since the Ordinance was enacted (although the external distance requirements have not been enforced).

constitutional obligations with evidence of 127 alternative available sites – one more than the number of existing SOBs and 32 more than the number of SOBs that sought a permit after Ordinance 97-75 was enacted.  As a result, the City must show that City Council reasonably believed there were at least 127 available alternative sites for SOBs at the time Ordinance 97-75 was adopted.

**B.      Procedure to Identify Available Alternative Sites**

The Court concludes that the pre- and post-enactment procedures utilized by the City to ascertain if there were sufficient alternative sites available not only satisfied constitutional requirements, the procedures far exceeded the requirements.   The evidence introduced at trial established that, pre-enactment, Chow identified through computer-generated research a universe of almost 7,600 sites that potentially could satisfy the locational requirements of the then-proposed ordinance and provide alternative locations for SOBs to operate.  Chow used computer programs that were quite sophisticated for the time, and used the most current data that he, in his professional opinion, considered reliable.   Chow presented his results to the Committee, and there was no reliable factual basis for the Committee to discredit the results.   Consequently, the Committee justifiably relied on Chow's report in considering whether there were adequate alternative sites available in Houston for SOBs affected by the proposed ordinance.  Substantively, the evidence before the

Committee was that 95 SOBs would have to close or relocate because of the new Ordinance's external distance requirements. The Committee also knew that Chow had identified 7,597 potential alternative sites within the City limits for those businesses to relocate. Given this evidence before it, City Council was reasonable in concluding that at least 1.3% of the identified sites would in fact be available to the SOBs under the new Ordinance and thus would provide constitutionally adequate alternative avenues of expression to the affected SOBs. The First Amendment requires no more from the City.

The City, in an exercise of caution and apparent good faith, went beyond its constitutional obligations and verified that Chow's list in fact contained an adequate number of available alternative sites. Using methodology similar to that which he used in his regular work as a Vice Division officer to evaluate applications for SOB permits, Andrews investigated approximately 1,500 sites from Chow's list and determined that at least 200 of them were available alternative sites.[15]

The estimating procedure performed by employees of the Planning Department was an appropriate means for City Council to determine the effect of the proposed Ordinance and to assure itself with an acceptable degree of precision under the

_____

[15]     Metrocom selected at random approximately 1,500 sites from the list of 7,597 potential sites identified by Chow.

circumstances that the Ordinance would not deprive the affected SOBs of reasonable avenues of expression. The verification process performed by the Vice Division clearly substantiated the fundamental result of the Planning Department's estimating procedure – that there were an adequate number of available alternative locations for SOBs to operate their businesses. Given the fiscal and logistical constraints on the City, the results of the estimating procedure and verification process were each sufficiently reliable.[16] Each of these procedures gave rise to results that were properly admitted at trial and that provided circumstantial evidence on which the Court relied in reaching its findings of fact in this case.

### C.   Specific Site Analysis Issues

The "City bears the burden of proving the existence of reasonable alternative sites." *N.W. Enterprises*, 352 F.3d at 182. As to a particular site suggested by the City, the Plaintiff SOBs have a burden to explain and present evidence to support any challenge to the site. *See id.* at 183. In the absence of particular challenges by Plaintiffs, "doubts as to the ordinance's constitutionality in its entirety may be easily dispelled . . .." *Id.*

---

[16]    The Vice Division's verification process, while appropriate and helpful, was not constitutionally required. It was, instead, a voluntary response to concerns raised by Plaintiffs in this case.

As noted, in the verification phase of the City's analysis of alternative avenues of expression, the City researched through Vice Division Officer Andrews approximately 500 sites.  Andrews identified 200 sites that he believed would be available for the operation of one or more types of SOB.[17]  Plaintiffs assert multiple challenges to these 200 sites,[18] which will be addressed in turn.  It is noted preliminarily that the City withdrew certain sites from consideration and Plaintiffs conceded they had no criticisms of other, different sites.

### 1.     Church Within 1,500 Feet

Ordinance 97-75 defines a "church" as:

A building, whether situated within the city or not, in which persons regularly assemble for religious worship intended primarily for purposes connected with such worship or for propagating a particular form of religious belief.

Ordinance, § 28-121.

Plaintiffs objected to the availability of several sites because there was located within 1,500 feet of the site a hospital or an airport in which there was a chapel.  The Court concludes that such chapels do not satisfy the definition of a "church" under the

---

[17]     As has been noted previously, after Andrews identified 200 available alternative sites, the investigation ended without review of other potential sites.

[18]     The Ordinance contains distance requirements involving distances that are "within" either 1,000 feet or 1,500 feet of a second property.  A distance of *exactly* 1,000 feet or 1,500 feet is not – and was not ever treated by the Vice Division as – *within* the applicable distance and, therefore, would not disqualify the proposed site.

Ordinance because Plaintiffs presented no evidence that any of these chapels in an airport or hospital is in a "building . . . in which persons regularly assemble for religious worship" or that the airport, hospital, or even the chapel itself was "intended primarily for purposes connected with such worship or for propagating a particular form of religious belief."[19]   Indeed, the City had construed Ordinance 97-75's predecessor, which contained the identical definition of a church, in this manner since a Hearing Officer held that such a chapel was not a church for purposes of that ordinance.  After this Hearing Officer's decision, the Vice Division did not deny applications for SOB permits based on the proximity to such chapels.  Because the chapels do not satisfy the definition of a church, the Court finds that sites within 1,500 feet of the facility containing a chapel are not disqualified on this basis.

Plaintiffs also objected to sites that were within 1,500 feet of a Jewish cemetery. There is no evidence that any part of the cemetery was regularly used for worship and, as a result, the Court finds that sites challenged because they were within 1,500 feet of a Jewish cemetery are not disqualified on this basis.

Plaintiffs also objected to sites that were within 1,500 feet of a "religious" land use code on the Metrocom map.  Andrews testified, and the Court finds as to each, that

---

[19]     The timing focus is on the date Ordinance 97-75 was adopted in January 1997.  The Court has considered but is unpersuaded by Plaintiffs' evidence concerning services at Houston's Intercontinental Airport.

there were no active churches as defined by the Ordinance within 1,500 feet of the particular sites relied on by Plaintiffs.

Plaintiffs also argued that certain sites were not available because they were within 1,500 feet of specific churches.  In 1997, neither Southern Bible College nor Aldine House of Prayer qualified as a church as defined by the Ordinance, but the Court finds that Site 742 was within 1,500 feet of Grace Church and Site 1879 was within 1,500 feet of Brighton Church.  These two sites are disqualified and cannot serve as an available alternative site because they were within 1,500 feet of a church.

### 2.    Licensed Daycare Center Within 1,500 Feet

Ordinance 97-75 defines a "licensed day-care center" as:

> A facility licensed by the State of Texas, whether situated within the city or not, that provides care, training, education, custody, treatment or supervision for more than twelve (12) children under fourteen (14) years of age, where such children are not related by blood, marriage or adoption to the owner or operator of the facility, for less than twenty-four (24) hours a day, regardless of whether or not the facility is operated for a profit or charges for the services it offers.

Ordinance 97-75, § 28-121.  Only licensed daycare centers would disqualify a site within 1,500 feet.  The Court finds that no proposed sites were disqualified for being within 1,500 feet of a licensed daycare center.

### 3.    Park Within 1,500 Feet

Ordinance 97-75 defines a "public park" as:

> A publicly owned or leased tract of land, whether situated in the city or not, designated, dedicated, controlled, maintained and operated for use by the general public for active or passive recreational or leisure purposes by the city or any political subdivision of the state and containing improvements, pathways, access or facilities intended for public recreational use.  The term "public park" shall not include parkways, public roads, right-of-way, esplanades, traffic circles, easements or traffic triangles unless such tracts or areas contain and provide improvements or access to a recreational or leisure use by the public.  A current list of public parks shall be compiled and revised by the Director of the Parks and Recreation Department and maintained for public inspection in the office of the City Secretary.

*Id.*  The Houston City Secretary maintained a list of public parks.  Enforcement of Ordinance 97-75 would disqualify an SOB site if it were within 1,500 feet of a public park on this list.

Plaintiffs argue that certain sites were not available because they were located within 1,500 feet of a public park.  The Court finds that the Catherine Keegan Wilderness Ranch was not a public park as defined by the Ordinance.  The Court finds that Cullinan Park, Memorial Park, and Jones Park are not within 1,500 feet of the proposed sites.[20]  The Court finds, however, that Site 2317 is within 1,500 feet of Verne Cox Center (a public park in Pasadena, Texas) and Site 2776 is within 1,500 feet

---

[20]     Again, the Court holds that a distance of *exactly* 1,500 feet is not – and was not ever treated by the Vice Division as – *within* the applicable distance and, therefore, would not disqualify the proposed site.

of Harwin Park.  As a result, these two sites are not available alternative sites for an

SOB.

### 4.    School Within 1,500 Feet

Ordinance 97-75 defines a "school" as:

A building, whether situated within the city or not, where persons regularly assemble for the purpose of instruction or education together with the playgrounds, stadia and other structures or grounds used in conjunction therewith.  The term is limited to:

(1)    Public and private schools used for primary or secondary education, in which any regular kindergarten or grades one (1) through twelve (12) classes are taught; and

(2)    Special educational facilities in which students who have physical or learning disabilities receive specialized education in lieu of attending regular classes in kindergarten or any of grades one (1) through twelve (12).

*Id.*  Schools used for purposes other than primary or secondary education would not

disqualify a site within 1,500 feet.

Plaintiffs objected to sites that were within 1,500 feet of a Houston Independent

School District ("H.I.S.D.") stadium or bus barn.  The Court concludes that a stadium

"used in conjunction" with a particular school as defined by the Ordinance would

disqualify a site within 1,500 feet, while a stadium that was simply owned by H.I.S.D.

but not used in conjunction with a specific school would not be disqualifying.  The

Court finds that Delmar Stadium, the H.I.S.D. bus barn, and Butler Stadium do not

satisfy the Ordinance's definition of "school" because they were not used in connection with any particular school but are, instead, owned by H.I.S.D. for its general use. The City presented evidence, and the Court finds, that the Vice Division never denied an SOB permit application based on its proximity to an H.I.S.D. facility not used in conjunction with a specific school. As a result, sites within 1,500 feet of these three identified structures are not disqualified on that basis.

### 5.    Size of Parcel or Size of Building on Parcel

Plaintiffs object to numerous sites because either the property or the building on the site is either too large or too small, or, according to Plaintiffs, the sites do not have adequate space for parking for an SOB. These objections are without merit. Size concerns are not unreasonable obstacles that cannot be overcome. *See Woodall*, 49 F.3d at 1124 (noting that the "relevant consideration is whether the physical characteristics of the site present an unreasonable obstacle to opening a business").

Small parcels and buildings can accommodate certain types of SOBs, such as modeling studios and adult bookstores, that require very little space for the business itself or for parking. For these SOBs, sites with small acreage, even as little as .2 acres, are sufficient. Additionally, small buildings can be expanded or torn down to permit construction of a building more attractive to an SOB. Businesses can and often do obtain variances from the City's parking requirements.

Large parcels and buildings are better for SOBs such as cabarets, that generally require buildings with thousands of square feet[21] and need substantial exterior space for parking large numbers of cars.  Large parcels of land can be subdivided and excess portions sold or leased to others, or an SOB may simply utilize less than an entire building if the structure is too large.

The size of the parcel, and the size or prior use of the building located on the site, are not disqualifying unless the parcel were so tiny that it could not physically accommodate any type of SOB.  The Court finds that none of the proposed sites is disqualified based on the size of the building or the parcel.

### 6.   Undesirable Location Or Prior Use Of Parcel

Plaintiffs complain that many of the sites were too far from other commercial areas, were in a shopping center, were in an industrial or construction area, were in a "bad neighborhood," or were otherwise in an undesirable location.  As to certain sites, Plaintiffs argued generally that the "tenant mix" was unsuitable.  With the exception of sites that were located in places such as an airport runway or underneath an interstate (no such sites are at issue in this case), Plaintiffs' complaints are not legally significant because they relate largely to the commercial viability of the site, not to its qualification constitutionally as an available site.  As is discussed more fully below, there is "no

---

[21]     Certain existing SOBs are located in structures with well more than 10,000 square feet.

requirement that an adult business be able to obtain existing commercial sites . . . with market access to ensure its prosperity." *Woodall*, 49 F.3d at 1124.  While the location of the site may have an impact on the commercial viability of an SOB, "commercial viability is not a relevant consideration."  *Id.*

Plaintiffs also complain that certain sites were or had previously been used for warehouses, cement factories, or other businesses that require a specialized building. As is the case for undesirable locations, undesirable prior uses are not disqualifying. *See Renton*, 475 U.S. at 53 (available sites included property developed for industrial and warehouse use).

### 7.    Commercial Viability

Plaintiffs objected to a large number of sites as either "insufficient for generic commercial business" and/or "developed in a manner totally incompatible with any average commercial business."  The City is not constitutionally required, however, to identify commercially viable sites.  *See Woodall*, 49 F.3d at 1124 (holding that the fact that a site is not commercially viable does not preclude it from qualifying as an alternative available site).  Indeed, in the Fifth Circuit, "commercial viability is not a relevant consideration."  *Id.*

Plaintiffs place significant reliance on the statement in *Woodall* that a site may be excluded if it is "developed in a manner unsuitable for any generic commercial

business."  Plaintiffs' position is based on a misreading of the Fifth Circuit's directive. The Fifth Circuit's statement in *Woodall* that a site may be excluded if it is unsuitable for *any* generic commercial business allows the fact finder to exclude only a site on which *no* generic commercial business could operate, not to exclude a site that may be inappropriate for some ill-defined, average business.  Indeed, this Court's interpretation is reinforced by the next sentence in *Woodall* after the phrase so heavily relied upon by Plaintiffs, where the Court of Appeals states again, unequivocally, that "the fact that a site may not be commercially desirable does not render it unavailable."  *Id.*

Similarly, the Fifth Circuit held that there "is no requirement that an adult business be able to obtain existing commercial sites at low cost and with market access to ensure its prosperity."  *Id.*  In *Renton*, available sites included land "in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that is criss-crossed by freeways, highways and roads."  *Renton*, 475 U.S. at 53.

Based on this Supreme Court and Fifth Circuit authority, the Court concludes that commercial viability is not a consideration for determining whether a site is "available" for constitutional purposes.  The Court finds that none of the sites challenged as either "insufficient for generic commercial business" and/or "developed in a manner totally incompatible with any average commercial business" is disqualified as an alternative site for an SOB.

### 8.    Access, Roads and Other Infrastructure

Plaintiffs complain that various buildings were unsuitable because they had only a single entrance.  With reference to the requirements of Ordinance 97-75, only an SOB that operates as an arcade requires a separate entrance.  *See* Ordinance § 28-81.  As a result, no site is subject to disqualification because it lacked a separate entrance.

Plaintiffs also objected to various sites because they lacked an adequate infrastructure, such as paved roads, electricity, or sewage facilities.  To the extent that there is no infrastructure near the parcel, the absence of basic infrastructure would present an unreasonable obstacle to opening a business on the site.  The Court finds that Site 2058 has no public road whatsoever, and Sites 1247 and 2824, during Andrews's inspection, lacked paved roads to the tracts.  As to these parcels, Plaintiffs' position is well-taken and the Court finds that these three sites are disqualified.  *See Woodall*, 49 F.3d at 1124.  However, the mere absence of a major roadway does not disqualify a site.  *See id.*

### 9.    Easements and Environmental Issues

Plaintiffs argue that some of the sites are not available alternative sites because they were subject to utility, railroad, or other easements.  Easements or railroad tracks are not disqualifying unless they cover the entire site such that nothing else can exist.  Easements or railroad tracks along an edge of larger properties are clearly not

disqualifying because the remainder of the property remains available for business use. The Court finds that utility and railroad easements such as those present on the challenged sites in this case do not render the site unusable and, therefore, none of the sites challenged by Plaintiffs based on an easement or right of way is disqualified on that basis.

Plaintiffs also challenge some of the sites listed by the City because the sites were later found to have environmental problems or potential environmental issues. Although a toxic waste dump clearly would not be an available alternative site for a business,[22] a subsequently-discovered environmental concern unknown in January 1997 does not render the site unavailable at the relevant time. The evidence established, and the Court finds, that the identified environmental issues were not known in January 1997. These concerns, therefore, do not disqualify the proposed sites.

### 10.    Long Term Leases and Deed Restrictions

Plaintiffs object to a number of sites because they were subject either to long term leases or to deed restrictions or other restrictive covenants. The Court holds that the City is under no obligation when contemplating a new ordinance with potential First Amendment implications to search title and other property records to determine

---

[22]    Indeed, Chow and Andrews both eliminated any site which they identified as containing hazardous waste.

whether a potential site is subject to a long term lease or deed restrictions.[23]   There is
no basis in the appellate authorities to place this burden on a municipality if there are
numerous potential available sites to which affected SOBs may relocate.

The existence of a long term lease, even if shown to exist, would not disqualify
a site.[24]   *See Renton*, 475 U.S. at 53; *Woodall*, 49 F.3d at 1125-26 (finding it "patently
irrelevant" that the site was currently occupied or leased).   Property often can be sublet,
and leases are often terminated by existing tenants.   The Court finds that none of the
proposed sites is disqualified based on the existence of a long term lease.

Similarly, most deed restrictions do not render a site unavailable.   *See Centerfold
Club, Inc. v. City of St. Petersburg*, 969 F. Supp. 1288, 1302 (M.D. Fla. 1997)
(holding that "[m]unicipal or local governments are under no obligation either to dictate
that third parties make their land available to adult establishments or to consider
whether such private restrictions in fact exist").   This is particularly true where, as was
the case for certain sites challenged by Plaintiffs, the deed restrictions were not
imposed until after the date the relevant ordinance was adopted.   Consequently, the
Court holds that a restriction describing certain types of permitted and precluded uses

---

[23]   Where, however, evidence of such deed restrictions is presented to the City, they should be
considered if they specifically preclude use of the property for a sexually oriented business.

[24]   As for Site 293, Plaintiffs were unable to find evidence of a long term lease.   Regarding Site
2160, the lease was executed after the adoption of Ordinance 97-75.

for the property would not generally disqualify a site.[25]  For example, deed restrictions favoring certain types of businesses, such as retail, commercial, restaurants, and theaters, clearly do not preclude all types of SOBs.  Similarly, other deed restrictions provided that the property should be used for certain purposes – such as commercial or retail businesses – and then purported to preclude businesses that are "obnoxious" or "out of harmony" with the favored use described in the deed.  Such deed restrictions are not disqualifying.  Also, Plaintiffs have not demonstrated that any attempts to enforce these deed restrictions would be successful as to any specific parcel.[26]  As a result, the Court finds that these restrictions, even if known to the City, do not preclude all SOBs and do not disqualify an otherwise available site.

Plaintiffs presented evidence, however, of three sites that are subject to deed restrictions that were in place before Ordinance 97-75 was adopted and that specifically preclude use of the site for a sexually-oriented business.  This is a "legal characteristic that exclude[s] adult businesses" and, once identified by a challenger with supporting evidence, these sites would not be available as an alternative avenue of communication.

---

[25]     For several sites, Plaintiffs relied on a deed restriction that was not timely produced during discovery.  As a result, the deed restriction was excluded from evidence and cannot be used to disqualify the site.

[26]     Indeed, Andrews testified that the Heights Association, a Houston neighborhood association, lodged a protest against an SOB permit application based on deed restrictions and the protest was unsuccessful.

*See Woodall v. City of El Paso*, 959 F.2d 1305, 1306 (5th Cir. 1992) ("*Woodall II*").

These restrictions, if known to the City, would disqualify a site and, therefore, the

Court finds that Sites 343, 1879, and 2744 are disqualified on this basis as alternative

available sites in this case.

### 11.    Proximity to Another SOB

The Ordinance precludes two SOBs from operating within 1,000 feet of each

other.[27]  An existing SOB within the City limits would disqualify a second SOB from

obtaining a license to operate within 1,000 feet.  However, this disqualification applies

only if the original SOB were licensed by the City.[28]  Unlicensed SOBs are not

disqualifying.  The Court finds that the SOBs that Plaintiffs argue disqualify a proposed

site are either unlicensed or are not qualified for a license under Ordinance 97-75.  As

a result, these challenged sites are available alternative sites for an SOB.

### 12.    Government-Owned Sites

Plaintiffs argued that several sites were unavailable because they were owned

by a governmental entity.  Plaintiffs cite no Fifth Circuit or Supreme Court authority

that supports this argument.  The City withdrew a few sites that were both owned by

---

[27]    As noted earlier, if the sites are 1,000 feet from each other exactly, then neither is disqualified because they are not "within" 1,000 feet of each other.

[28]    The 1,000 feet distance is measured "from the nearest point on the property line of the applicant's enterprise to the nearest point on the property line of any other enterprise." Ordinance, § 28-125(b)(2).

the government and dedicated for use as part of a City-owned airport.  The situation

involved in these withdrawn sites was analogous to the situation mentioned in *Woodall*

for sites that are located on "airstrips of international airports." *See Woodall*, 49 F.3d

at 1124.  Generally, however, simple ownership by a governmental entity does not

disqualify a site.

The Court finds, however, that Site 259 was state owned and, in January 1997,

was being used in connection with the construction of a controlled access highway.

Site 259, therefore, is disqualified, but the other challenged sites are not disqualified

on the basis of governmental ownership.

### 13.    Plaintiffs' Difficulty Locating Site

Plaintiffs initially complained that they had difficulty locating many of the sites

because the photograph or description Andrews included in his notebook was

inconsistent with the HCAD records or the parcels observed on-site.  Based on this

difficulty, Plaintiffs also objected to certain sites as being outside the Houston city

limits.

Plaintiffs and their expert did not initially rely on the Metrocom maps, although

the maps were available.  Andrews clarified, with reference to the maps, which sites

were at issue and that they were located within the city limits.  The Court finds that

Plaintiffs' difficulties and confusion do not render an otherwise available site unavailable.

### 14.   Residential Density Requirement

Plaintiffs objected to numerous sites because the land use codes on the Metrocom maps indicated that the sites did not satisfy the residential density requirements of Ordinance 97-75.  Residential density is determined by calculating the percentage of tracts that were residential in character within a circle with a radius of 1,500 feet from the center of the SOB enterprise location.[29]  An SOB permit could not be granted if 75% or more of tracts within the circle were "residential in character." Ordinance, § 28-125(b)(3).

The Ordinance defined "residential" as follows:

> Pertaining to the use of land, whether situated within the city or not, for premises such as homes, townhomes, patio homes, manufactured homes, duplexes, condominiums and apartment complexes, which contain habitable rooms for nontransient occupancy and which are designed primarily for living, sleeping, cooking, and eating therein.  A premises which is designed primarily for living, sleeping, cooking and eating therein shall be deemed to be residential in character unless it is actually occupied and used exclusively for other purposes. . . . The term "residential" shall also include any unimproved tract designated for tax appraisal purposes as residential by the Harris County Appraisal District if situated in the City or by the appraisal district of the county in which the

---

[29]   The Ordinance provides that the "center" corresponds to "the midpoint of a line joining the two most distant points on the boundary of a tract on which the enterprise is located." Ordinance, § 28-125(b)(3).

tract is situated if not situated in the City.  The term additionally shall
include any tract, that, based upon the records of the planning official has
been subdivided or platted for residential use, but that is not yet
designated for tax appraisal purposes as residential.

*Id.*, § 28-121.  A "multifamily tract" was defined as:

Any residential tract that contains any building or buildings or portions
thereof, that is designed, built, rented, leased, sold, let out or hired out to
be occupied, or which is occupied, in separate units, each containing
living, sleeping and food preparation facilities, as the homes or residences
of three or more families, groups, or individuals living independently of
each other.

*Id.*  Multifamily tracts were counted based on the tax record acreage of the multifamily

tract, with one-eighth of an acre treated as one residential tract.  *See* Ordinance § 28-

125(b)(3).

Sites that appeared to be in highly residential areas were disqualified both during

Chow's work and later during Andrews's investigation.  For some sites, the maps

showed land use codes indicating high density residential areas, but Andrews's

investigation of the physical sites and surrounding areas in late 1997 and early 1998

often revealed development inconsistent with the land use codes.  Andrews'

conclusions from personal physical inspection of potential sites are more persuasive

than land use code designations on the Metrocom maps for most purposes in the

Court's analysis.  In many instances, the potential site was in a highly commercial or

mixed-use area.  For these sites, Andrews correctly did not disqualify the sites based

on the residential density requirement because his physical investigation revealed that the area was developed for uses other than residential and the more reliable personal inspection governs the Court's analysis.

In other instances, the site was in or near "unimproved," *i.e.* undeveloped, land. As to those sites, Andrews considered the Metrocom use codes for residential uses generally, but did not do detailed calculations as to all residential or multifamily residences. He also conceded that he did not, as the Ordinance requires, consult with the taxing authorities to determine whether the undeveloped areas had been platted as residential but not yet designated for tax appraisal purposes. The Court concludes that sites near undeveloped areas that contained a "residential" land use code on the map should be excluded if Plaintiffs have shown the 75% residential density provision of § 28-125(c)(3) was met.

As to Sites 384, 890, 1122, 1194, 1575, and 1705, Andrews's recollection is insufficiently clear to contradict the codes on the maps. Consequently, these six sites are excluded because the land use codes on the Metrocom maps indicate that the residential density exceeded 75%.

### 15.    Conclusion on Site Analysis

The City has presented evidence of no fewer than 168 sites that, in January 1997, were available for the operation of an SOB.

## V.    SUMMARY AND JUDGMENT

The evidence introduced at trial established that the City of Houston, before adopting Ordinance 97-75, reasonably believed that there were an adequate number of available alternative sites for SOBs.  The City's belief in this regard is supported by a preponderance of the evidence.  The City engaged in an adequate analysis to determine whether a sufficient number of available alternative sites existed in Houston to accommodate SOBs that would be displaced by the enforcement of Ordinance 97-75. The Planning Department used computer programs and property data that were the best available at the time and, significantly, that the City relied on for other, unrelated municipal business.  Chow, through his analysis, identified 7,597 available alternative sites.  There were 126 licensed SOBs in January 1997, including the 25 SOBs which were protected by an injunction in a different case.  The City was aware that 95 of these businesses would be required to relocate after Ordinance 97-75 was adopted.  It was clearly reasonable for City Council to believe there were at least an adequate number of sites among the 7,597 on Chow's list to provide alternative avenues for communication for significantly more than the number of existing licensed SOBs.

Additionally, the evidence at trial verified the City's belief that, at the time Ordinance 97-75 was enacted in January 1997, there in fact were reasonable alternative locations for SOBs in an adequate number to accommodate businesses displaced or

otherwise affected by Ordinance 97-75.[30]  Of the more than 7,500 parcels identified by Chow, Vice Division officers looked at approximately 1,500 properties.  Of this more than 1,500 sites, more than 1,000 (approximately 2/3) passed this initial phase of Andrews's investigation.  Andrews personally visited approximately 500 of those sites, of which the Court finds at least 168 qualified as reasonably alternative available sites.

Based on the foregoing findings of fact and conclusions of law, the Court holds that Ordinance 97-75 does not violate Plaintiffs' First Amendment rights.  It is therefore **ORDERED** that judgment is entered in favor of Defendant City of Houston.

The Court will issue a separate final judgment consistent with these findings of fact and conclusions of law.

SIGNED at Houston, Texas, this **31st** day of **January, 2007.**

Nancy F. Atlas
United States District Judge

---

[30]     The Court reiterates that this more detailed investigation was not constitutionally required, but served to verify City Council's pre-enactment understanding that enforcement of Ordinance 97-75 would not violate the First Amendment.